UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA :

- v. - : 12 Cr. 545 (DLC)

ERIN DAVIS, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York

Janis Echenberg
Nicole Friedlander
Assistant United States Attorneys

- Of Counsel -



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 17, 2013

Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: United States v. Erin Davis**
**12 Cr. 545 (DLC)**

Dear Judge Cote:

The Government respectfully submits this letter in connection with the sentencing of defendant Erin Davis ("Davis" or the "defendant") , which is currently scheduled for May 23, 2013 at 2 p.m. On January 10, 2013, Davis pled guilty, pursuant to a plea agreement with the Government, to Count One of the above-captioned Indictment – a conspiracy to commit wire, mail and bank fraud from April 2007 to October 2010. In the plea agreement, the defendant and the Government stipulated that a sentence within the United States Sentencing Guidelines (the "Guidelines") range of 24 to 30 months' imprisonment would constitute a reasonable sentence. The Probation Office agrees with the stipulated Guidelines range but recommends that the defendant be sentenced to a term of one year and one day imprisonment, followed by a supervised release term of two years. (Presentence Investigation Report, dated May 14, 2013 ("PSR") at 29.) For the reasons set forth below, the Government respectfully submits that a sentence within the stipulated Guidelines range would be sufficient, but not greater than necessary, to comply with the purposes of sentencing in this case.[1]

[1] To the extent defense counsel makes a submission in advance of sentencing, the Government respectfully requests leave to respond to that submission as appropriate.

## BACKGROUND

Together with her co-defendant Mitchell Cohen and others, Davis committed a sophisticated mortgage fraud over a period of several years. Davis served as the primary sales manager for Cohen's various real estate brokerage businesses for over 20 years. For over three years, she facilitated the charged fraud in many ways, principally by preparing fraudulent gift affidavits which falsely stated that relatives of buyers had given gifts toward the purchase of a home when, in fact, the extra cash came from Cohen himself. Davis knew these statements were false and that they were made in an effort to make the buyers appear more creditworthy than they actually were.

Between April 2007 and October 2010, Cohen ran a real estate brokerage business in Queens, New York, which operated under a variety of names including Buy-a-Home, LLC and First Home Brokerage, LLC (collectively, "Buy-a-Home"). Davis served as his primary sales manager during this time, assisting Cohen and other sales manages and agents to convince clients to buy homes Buy-a-Home was selling and serving as a liaison between Buy-a-Home's clients and several mortgage lending companies to ensure that clients obtained a mortgage to fund the purchase of the home. Davis earned a commission for each home sold by Buy-a-Home, including properties where other agents and managers took the lead in the sales process. (PSR ¶ 16).

For at least three and half years, Davis was a Cohen's right hand assistant in an elaborate scheme to fraudulently induce HUD to issue FHA insurance for certain home mortgage loans and to fraudulently induce certain banks, specifically CitiMortgage, Countrywide and U.S. Bank, to purchase the loans, through the submission, to HUD and the banks, of false and misleading information regarding the borrowers' financial condition and creditworthiness. Through Cohen's brokerage businesses, Cohen, Davis, and others at Buy-a-Home, recruited unsophisticated and financially unqualified borrowers to purchase homes, which were either in a state of serious disrepair, or were still under construction. To justify inflated sales prices, Cohen promised the buyers he would make significant repairs to the homes, but then failed to make those repairs, or made primarily cosmetic repairs, in advance of selling the homes. While Davis did not play a direct role in failing to uphold these promises, she was certainly aware of clients' displeasure because of the large volume of complaints made by phone and in person during the relevant time period. Because these borrowers did not financially qualify for mortgage loans with FHA insurance, let alone conventional mortgage loans, Cohen, in coordination with certain employees from at least two mortgage lenders, orchestrated schemes to secure FHA insurance for mortgage loans through fraud. Davis' primary role in the scheme was to prepare the false gift affidavits and coordinate with other Buy-a-Home employees to deposit and withdraw cash from accounts to create supporting documentation for the false affidavits. (PSR ¶¶19-23).

The scheme typically worked as follows. First, Davis and sometimes other sales managers (at Cohen's direction), would provide cash to Buy-a-Home employees, and direct them to pay off borrowers' debts or to deposit the cash in the bank accounts of relatives of the

borrowers, and then immediately withdraw the cash in the form of a certified check, made out to the borrower's creditor. By doing so, they created the false appearance that borrowers had been able to pay off their debts themselves or through family members, which enabled them to qualify for HUD-insured mortgages where they otherwise would not have qualified. Cohen and Davis also provided cash to Buy-a-Home employees and directed them to deposit the cash in the bank accounts of relatives of the borrower, and then immediately withdraw the cash, again, in the form of a certified check, which was used to create the false appearance at closing that the borrower had sufficient funds to close. In an effort to cover up the source of these cash payments, Cohen and Davis directed the preparation of fake gift affidavits, filled out in most cases by Davis and signed by borrowers' relatives. The gift affidavits contained false assurances that the gift was made by a relative of the borrower, that the gift was not expected to be repaid, and that the gift had not been made by anyone with an interest in the sale of the property, including the seller or the real estate agent. The gift affidavits were then submitted to (i) lenders, for inclusion in the documents submitted to HUD for FHA insurance, and (ii) the banks who purchased the loans. Cohen, Davis and others at Buy-a-Home, at Cohen's or Davis' direction, also advised certain borrowers to falsely state on loan applications submitted to HUD that they intended to reside in the properties for which they were serving as co-borrowers. (PSR ¶¶ 21-24).

Through this scheme, Cohen, Davis and others defrauded HUD and the purchasing banks into issuing numerous FHA-insured mortgage loans, with a total face value of at least $7.5 million. Because the issuance of FHA insurance was based upon false statements made to HUD, and most of the borrowers could not truly afford the mortgage loans they were provided, many of those loans subsequently went into foreclosure proceedings. As a result, as of April 1, 2013, HUD has paid $117,922.19 in insurance payments related to loans where Davis personally created the false gift affidavits. (PSR ¶ 113). Many other properties remain in foreclosure, and will likely cause HUD to incur additional losses in the future.

## DISCUSSION

The Government submits that a sentence within the stipulated Guidelines range of 70 to 87 months' imprisonment would be sufficient, but not greater than necessary, to meet the legitimate purposes of sentencing. The Guidelines still provide strong guidance to the Court in light of United States v. Booker, 543 U.S. 220 (2005), although they are no longer mandatory. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that range "should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007). As the Second Circuit remarked en banc, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," Rita v. United States, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on

extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall, 128 S. Ct. at 594.; see also Rita 127 S. Ct. at 2464. After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a) ("the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, see id. § 3553(a)(2); "the kinds of sentences available," id. § 3553(a)(3); the Guidelines range itself, see id. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, see id. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," id. § 3553(a)(6); and "the need to provide restitution to any victims") and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in Section 3553(a)(2). Gall,128 S. Ct. at 596-97. To the extent a District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" Cavera, 550 F.3d at 188 (quoting Gall, 128 S. Ct. at 596).

The Nature, Circumstances, and Seriousness of the
Offense and the History and Characteristics of the Defendant

The defendant's criminal conduct is undoubtedly serious as mortgage fraud is a pervasive crime that has caused extensive harm to individuals and financial institutions around the country. The defendant, although serving a more minor role than her boss, Mitchell Cohen, was still an important part of the conduct in Count One that caused HUD to pay hundreds of thousands of dollars in FHA insurance payments, $117,922.19 of which is directly attributable to Davis' creation of false documents to assist buyers obtain mortgages they could not afford, which also caused problems for the banks who purchased the mortgages (and which initially incurred losses on the mortgages, although those losses are ultimately borne by HUD, who insured them).

The defendant managed a very important component of the fraud – doctoring the paperwork to make it appear as though the buyers were more creditworthy than they actually were. Moreover, the defendant received a commission of approximately $2,500 from each fraudulent loan. In a particularly telling example of the willful nature of her conduct, Davis prepared a gift affidavit listing Edward Narvaez, her then-boyfriend, as the brother-in-law of the buyer (a person he did not know), which she obviously knew to be a lie. She then deposited and withdrew money from her own bank account, which she shared with Narvaez, to make it look like a gift had been provided to the buyer by the buyer's relative. Finally, she whited-out her own name on the account statement, so only Narvaez's name appeared in the copy submitted as part of the loan file. Any claim that she was manipulated to commit this crime (*see* PSR ¶ 38, 73) is belied by the deliberate nature of her conduct with regard to this loan.

As for the defendant's background, including physical ailments and troubled relationships, as set forth in paragraphs 56-83 of the PSR, these circumstances, while appropriate for consideration under 18 U.S.C. § 3553(a)(1), do not excuse repeated knowing criminal behavior over a period of several years. The Probation Department agrees, noting that she is "not

without blame for her current circumstances," and recommending a sentence of incarceration. (PSR at 30).

Respect for the Law, Adequate Deterrence, and Protection of the Public

A term of imprisonment within the Guidelines Range would also promote respect for the law, protect the public, and provide both specific deterrence to the defendant and general deterrence to others. Davis worked for Cohen for a long time. She engaged in an unambiguous fraud for several years, and directed others at the office to commit the fraud, seemingly without hesitation, going so far as to use her own boyfriend and bank account to commit the fraud. Her half-sister also implied that she was unduly influenced by a corrupt industry. (PSR ¶ 75). Accordingly, specific and general deterrence are especially important here.

Comparison to Cohen's Sentence

Co-defendant Cohen was sentenced by Your Honor to 70 months' imprisonment, the bottom of his stipulated Guidelines range of 70 to 80 months' imprisonment. Davis' significantly lower Guidelines range of 24 to 30 months' imprisonment takes account of her more minor role in the fraud and holds her accountable for a lower loss amount, in line with the transactions in which she was directly involved and the loss that was therefore was reasonably foreseeable to her. Accordingly, a Guidelines sentence is equally appropriate for Davis.

Forfeiture and Restitution

Attached as Exhibit A is a proposed Consent Order of Forfeiture in the amount of $2,416,597, which represents the sum of the proceeds of the fraudulent transactions in which Davis was directly involved.

HUD's losses from the transactions in which Davis was directly involved totaled $117,992.19. Accordingly, and pursuant to Title 18, United States Code, Sections 3663 and 3663A, the Government respectfully requests that restitution be ordered in the amount of $117,992.19 to HUD, as set forth in the attached proposed Restitution Order, attached as Exhibit B.

## CONCLUSION

The Government respectfully requests that the Court impose a sentence within the Guidelines range of 24 to 30 months' imprisonment, as it is sufficient but not greater than necessary to serve the legitimate purposes of sentencing. The Government also respectfully requests that the defendant be ordered to forfeit $2,416,597 and that the Court order restitution of $117,922.19 to HUD as set forth above.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: ______________________________
Janis Echenberg
Nicole Friedlander
Assistant United States Attorney
(212) 637-2597

cc: Guy Oksenhendler, Esq. (by e-mail)